**In re Ahmed FRUGH and Christine Frugh, Debtors.**

**The FIFTH THIRD BANK OF TOLEDO N.A., fka First National Bank of Toledo, Plaintiff,**

v.

**Ahmed FRUGH, Defendant.**

**Bankruptcy No. 1–89–01153.
Adv. No. 89–0169.**

United States Bankruptcy Court,
N.D. Ohio, W.D.

Sept. 13, 1991.

Kenneth C. Baker, Toledo, Ohio, for plaintiff.

L. Mari Taoka, Toledo, Ohio, for defendant.

## OPINION AND ORDER DETERMINING DEBT TO BE DISCHARGED

WALTER J. KRASNIEWSKI, Bankruptcy Judge.

This matter came on for trial upon plaintiff's complaint to determine dischargeability of specific debt. Upon consideration of the evidence adduced at trial and the oral arguments of the parties, the court finds that the debt owed plaintiff from defendant should be discharged.

### FACTS

On May 1, 1989, Debtor/defendant filed a joint voluntary petition under chapter 7 of title 11 with his wife. Thereafter, on August 3, 1989, plaintiff filed a complaint objecting to discharge and to determine dischargeability of specific debt. Plaintiff contends that defendant, in executing a personal financial statement, made certain representations that defendant knew were false or made such statements with gross recklessness as to their truth, upon which plaintiff relied in extending credit to defendant, which resulted in a debt that should be excepted from discharge under 11 U.S.C. § 523(a)(2)(B).

The parties have stipulated to certain facts:

1. The lending relationship between [plaintiff] and defendant ... extends back to at least June of 1982, when [plaintiff] lent [defendant] $100,000.

2. On February 1, 1983, [plaintiff] renewed its 1982 loan to [defendant], then in the principal amount of $87,000, on a demand basis and [defendant] executed a promissory note to reflect the renewal of that loan

....

3. In April, 1986, [defendant] approached [plaintiff] and requested a $500,000 loan to permit him to repay certain indebtedness to First Federal Savings and Loan Association of Toledo ("First Federal"). In connection with his application and request, [defendant] submitted to [plaintiff] the personal financial statement marked as Plaintiff's Exhibit 20.

4. [Defendant] did receive a $500,000 loan from [plaintiff] and collateralized that loan with a $250,000 certificate of deposit. In October, 1986, the certificate of deposit matured and was used by [plaintiff] to reduce the principal balance of [defendant's] loan from $500,000 to $250,000. [Defendant] never made any further principal reductions on this loan, and this loan was thereafter renewed periodically at [defendant's] request. [Defendant] paid about $60,000 in interest on this loan between the time the loan was taken out and fall, 1988.

5. In June, 1986, [defendant] purchased the 40.12% limited partnership interest in Interstate Lanes, a limited partnership owning a bowling alley in Rossford, Ohio, also known as Interstate Lanes. In connection with his acquisition of this partnership interest, [defendant] guaranteed $400,000 of that partnership's indebtedness to Ohio Citizens

Bank. To reflect this arrangement, [defendant] executed a Guaranty in favor of Ohio Citizens Bank, a true copy of which is marked as Plaintiff's Exhibit 21. Ohio Citizens Bank's loan to the partnership was subsequently acquired by BancOhio.

\* \* \* \* \* \*

7. At the time [defendant] filed his petition in this case, the outstanding balance of this guaranteed obligation to BancOhio was $380,554.11.

\* \* \* \* \* \*

10. On August 31, 1988, in response to [plaintiff's] letter of August 22, 1988 (Exhibit 10), [defendant] forwarded to [plaintiff] his letter of August 31, 1988 (Exhibit 11,), his financial statement (Exhibit 1–A) and his 1987 income tax return (Exhibit 5). [Defendant] maintains that he also provided [plaintiff] with a copy of a deed to his home at this time.

\* \* \* \* \* \*

13. On his bankruptcy schedules [defendant] valued his partnership interest in Interstate Lanes as having no market value.

\* \* \* \* \* \*

16. Exhibit 19 is a true copy of the mortgage executed by [defendant] and his wife in favor of [plaintiff] on the property known as 2902 Shoreland.

Stipulation at 2–4 (August 29, 1991).

Ms. Ann Sciarini, formerly employed as a commercial loan and investment officer with plaintiff, testified that she became involved in defendant's loans through the normal course of business. She indicated that she was in charge of monitoring defendant's loans and was interested in converting the demand notes to some other principal reduction installment method.

Plaintiff requested that defendant provide it with a financial statement and tax returns after his account became delinquent; the latest financial information in plaintiff's file was a 1986 financial statement. Plaintiff's Exhibit 7. Ms. Sciarini testified that she received defendant's financial statement around August 31, 1988. Plaintiff's Exhibit 1A. Upon receipt of this document. Ms. Sciarini noticed that the figures contained therein did not calculate correctly. As a result, she subsequently contacted defendant by telephone to discuss the information contained on the statement. She made certain hand written entries on the statement, based on the conversation with defendant. Plaintiff's Exhibit 1B. She also received a credit report on or about August 26, 1988, which reflected two foreclosure proceedings. Plaintiff's Exhibit 6. However, Ms. Sciarini testified that often information is not received by the credit bureau in a timely fashion and based upon her conversation with defendant, she believed the referenced foreclosures were released or paid. She admitted that she felt no compulsion to inquire regarding the status of these foreclosures.

Ms. Sciarini further opined that she understood that plaintiff had a long standing relationship with defendant and had not experienced any problems with defendant's loan arrangements. She, therefore, had no reason to believe the financial statement contained inaccuracies. After her conversation with defendant, Ms. Sciarini, in the normal course of her duties, prepared a news sheet reflecting the parties' agreement that defendant would consolidate the two loans and secure it with a second mortgage on his residential property. Plaintiff's Exhibit 13. Ms. Sciarini further stated that defendant had informed her that he planned to sell "the commercial building", the Monroe Street property. *Id.* Finally, Ms. Sciarini opined that plaintiff's basis for renewal of the loan arrangements with defendant was premised upon a restructuring of the terms of the loans and the granting of a mortgage on defendant's residence, both of which plaintiff obtained.

## DISCUSSION

Although plaintiff's complaint is captioned as "objecting to discharge and to dischargeability of specific debt", it cites only 11 U.S.C. § 523(a)(2)(B) in support of its allegations. Furthermore, plaintiff's briefs, evidence and oral arguments are pertinent only to a § 523 action. The court will, then, analyze plaintiff's claim under this section.

■ Section 523(a)(2)(B) provides that a discharge does not discharge any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

\* \* \* \* \* \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the Debtor' or an insider's financial condition;

(iii) on which the creditor to whom the Debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the Debtor caused to be made or published with intent to deceive....

Plaintiff has the burden of proving each of these elements by a preponderance of the evidence. *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The parties dispute whether the financial statement provided to plaintiff was materially false.

A financial statement is "materially false" if it contains an important or substantial untruth. The omission, concealment, or understatement of a Debtor's material liabilities constitutes a "materially false" statement. A recurring guidepost used by courts has been whether the creditor would have made the loan had it known of Debtor's true financial condition.

*In re Galizia,* 108 B.R. 63, 67 (Bkrtcy. W.D.Pa.1989) (citations omitted). *See also In re Greene,* 96 B.R. 279 (9th Cir. B.A.P.1989) (materially false statement is one which paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally effect the decision to grant credit; such a statement can be premised upon inclusion of false information or the omission of information about Debtor's financial condition of the type affecting a creditor's decision making process); *In re Pretner,* 110 B.R. 942 (Bkrtcy.D.Colo.1990) (material falsity in a financial statement can be premised upon inclusion of false information or upon the omission of information about a Debtor's financial condition;

a financial statement which misrepresents the Debtor's ownership of an asset or which does not disclose the true ownership of assets included within the Debtor's property is materially false (citation omitted)).

■ In analyzing the dischargeability of the debt owed plaintiff from defendant, the court must bear in mind that exceptions to discharge are to be strictly construed against the creditor and in favor of the Debtor as an exception can significantly affect a Debtor's fresh start. *In re Calvo,* 111 B.R. 1003 (Bkrtcy.M.D.Fla.1990); *In re Hall,* 109 B.R. 149, 153 (Bkrtcy.W.D.Pa. 1990).

■ Reviewing the financial statement provided by defendant to plaintiff, the court notes that the typed assets figures and liabilities figures do not add up to the typed "total assets" and "total liabilities" figures. Plaintiff's Exhibit 1A. Ms. Sciarini testified that, upon her review of this statement, she came to this same conclusion, and, subsequently, contacted defendant. *See supra* p. 873. As a result of their conversation, Ms. Sciarini, in her own hand writing, entered corrected figures on the statement. Plaintiff's Exhibit 1B. Defendant stated at trial that he explained to Ms. Sciarini that the statement was typed by the girls in his office and contained typographical errors. In fact, it appears that defendant's original hand written copy contained the correct figures. *See* Defendant's Exhibit A. Thus, although the original typed figures may have contained some inaccuracies, these figures were corrected by plaintiff after contacting defendant.

■ The parties also dispute whether plaintiff reasonably relied upon the statement provided by defendant. Initially, the court notes that the latest financial statement available to plaintiff, prior to defendant's submission of the statement in issue, was 1986, two years earlier. Apparently, plaintiff had not requested annual financial disclosures. In addition to requesting that defendant provide a financial statement, plaintiff requested a credit report. Plaintiff's Exhibit 6. Ms. Sciarini testified that although this report reflected two fore-

closure proceedings, she believed they were either released or paid and expended no effort in verifying these assumptions. *See supra* p. 873.

The reasonableness of such reliance is to be judged by an objective standard—i.e., that degree of care which would be exercised by a reasonably cautious person in an average business transaction under similar circumstances.

\* \* \* \* \* \*

The requirement of reasonableness places a measure of responsibility upon the creditor to ensure that there is some basis for relying upon the Debtor's representations. Reasonableness is to be evaluated in accordance with the particular facts and circumstances of a given case. Even a strong showing that the Debtor has made false representations will not excuse the creditor's failure to demonstrate reasonable reliance.

*Galizia*, 108 B.R. at 68, 69 (citations omitted). The court finds that plaintiff could have, and should have, verified the valuations and disposition of the foreclosure suits; it did neither. *See In re Ward*, 857 F.2d 1082 (6th Cir.1988) (a lender must investigate creditworthiness and ferret out ordinary credit information; reliance was unreasonable and the § 523 exception to discharge, which this court is constrained to construe narrowly, is unavailable (citations omitted)); *In re Mullet*, 817 F.2d 677 (10th Cir.1987) (the bank obtained a credit report which reflected several outstanding loans not disclosed on Debtor's financial statement; the bank did nothing to investigate the reasons for the discrepancies between the financial statement and credit report and thus bank failed to carry its burden in establishing the reasonableness of its reliance); *In re Wing*, 96 B.R. 369, 373 (Bkrtcy.M.D.1989) (financial statements are substantially incomplete with numerous blanks, and apparent values of real estate holdings that are vastly inflated; bank could have, and should have, required verification of these figures before they extended credit to the defendant; it did not). The court is not persuaded that plaintiff's reliance on the financial statement in issue was reasonable.

The court is also unconvinced that defendant made the statement with intent to deceive. The standard for determining intent to deceive includes recklessness, indifference, and disregard for accuracy. *In re Martin*, 761 F.2d 1163, 1167 (6th Cir.1985). In determining defendant's intent in publishing the statement, plaintiff may present circumstantial evidence from which defendant's intent may be inferred. *Galizia*, 108 B.R. at 68. *See also In re Rental Journal, Inc.*, 111 B.R. 1012, 1015 (Bkrtcy.S.D.Fla.1989) (court may find deceit and fraudulent intent by logically inferring from the totality of the circumstances). Defendant may not, then, simply assert his honest intent, in overcoming this evidence. *Id.*

Additionally, as a result of the parties' negotiations, defendant granted a mortgage on his residence to plaintiff, obtaining his wife's signature on the mortgage documents. Considering the totality of the circumstances and the final terms of the parties' loan arrangement, the court does not find that defendant acted with intent to deceive, recklessness, indifference or a disregard for accuracy. Defendant cooperated with plaintiff in renegotiating the terms of the loans. In fact, Ms. Sciarini stated that the bank obtained those conditions which it wanted, to-wit: defendant's wife's signature on the documents and a mortgage on their residence.

Plaintiff specifically alleges that defendant inflated the value of his interest in Interstate Lanes, a partnership. In purchasing his 40% interest in this entity, defendant paid $100,000 and guaranteed a $400,000 debt. It was defendant's understanding, however, that the other partners guaranteed defendant's payments of that $400,000 debt. Defendant valued his interest at $1,400,000, although it is listed as "$140,000" on the financial statement. Defendant reached this valuation as a result of certain negotiations, although not reduced to writing, which he believed would culminate in an offer of $4,000,000. He valued his interest, then, at 40% of this

offer, or $1,400,000. Presently, he admitted, no offers to purchase are pending. Plaintiff also complains that defendant overvalued real estate consisting of office buildings on Monroe Street. Defendant intended to value this property at $3,500,000 as a result of the mortgage holder's appraisal of $3,500,000. Defendant's Exhibit D. Subsequently, this realty was foreclosed upon and sold for $1,300,000, although the sheriff's appraisal, prior to that sale, was for $2,000,000.

Following the *Calvo* court, *supra,* defendant's

valuation of assets on a loan application is the declarant's subjective opinion, and there is generally no basis to infer fraud if the valuation turns out to be incorrect.

*Calvo,* 111 B.R. at 1006. The court finds this analysis appropriate to defendant's valuation of his interest in the Interstate Lanes and Monroe Street property, as he based it on ongoing negotiations for sale of that interest and the mortgage holder's appraisal. Defendant's Exhibit D. Subsequently, these valuations, obviously, proved inaccurate, but the court does not find the appraisals so lacking in merit as to be indicative of an intent to deceive. *See Calvo,* 111 B.R. at 1006 (when valuation is so completely without foundation, one can only conclude that valuation was beyond mere puffery, and instead was stated for the primary purpose of inducing the lender to lend money).

Plaintiff also states that defendant failed to list all his outstanding liabilities on mortgages on certain properties. Defendant testified that although one liability is listed as $30,000 on the financial statement, the total liabilities are listed as $3,425,000, thus, according to defendant, it is obvious that the $30,000 figure was a typographical error and should have read "$3,000,000." *Compare* Defendant's Exhibit A *with* Plaintiff's Exhibit 1A (Exhibit A reflects notes payable of $3,000,000; 1A reflects, $30,000). Additionally, Ms. Sciarini printed in her own handwriting, this figure, recalculating the total liabilities figure. Plaintiff's Exhibit 1B. The court is convinced that defendant did not intentionally omit this liability from the financial statement; rather, it is included and plaintiff should have investigated its entry further.

Plaintiff alleges that defendant failed to include several outstanding mortgages on real estate properties in the financial statement. Although the financial statement submitted by defendant does not contain these mortgages, Ms. Sciarini wrote in these mortgages on plaintiff's copy. Plaintiff's Exhibit 1B. Thus, plaintiff was aware of defendant's liabilities on these obligations.

Plaintiff also complains that defendant valued his personal property for purposes of the financial statement at $100,000, yet, he valued his personalty on his petition, filed some nine months after plaintiff's receipt of the financial statement, at $12,000. *See* Petition May 1, 1989. Defendant stated that, in preparing the financial statement, he used the cost method. That is, in his practice of neurology and electroencephalography, he purchased several pieces of expensive business equipment, and the cost of these instruments are as high as $18,000. However, in bankruptcy, liquidation of these instruments may result in only a few thousand dollars. Once again, the court finds defendant's testimony credible, evidencing no recklessness or intent to deceive.

Having found that defendant did not publish a financial statement that was materially false, with intent to deceive, upon which plaintiff reasonably relied, it is therefore

ORDERED that defendant's debt owed plaintiff be, and it hereby is, discharged.