7 F.3d 234
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
In re Paul D. NEWMAN and Norma J. Newman, Debtors.
MICHIGAN NATIONAL BANK, Plaintiff-Appellant,
v.
Paul D. NEWMAN and Norma J. Newman, Defendants-Appellees.
 No. 92-2007.
 United States Court of Appeals, Sixth Circuit.
 Aug. 27, 1993.
 
 Before: JONES and BATCHELDER, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff Michigan National Bank ("Bank") appeals the bankruptcy court's decision that the Newman's debt to the Bank was dischargeable in bankruptcy. The Bank argued before the bankruptcy court and again on appeal that the debt was nondischargeable under 11 U.S.C. § 523(a)(2)(B), asserting that the debtors made fraudulent misrepresentations of their financial condition when they applied for the loan. The issue we must decide is whether the proof offered in the bankruptcy court was sufficient to carry the Bank's burden of proving that the debtors' representations of their financial condition were in fact false.
 
 
 2
 * On December 5, 1987, Defendants Paul and Norma Newman submitted a financial statement to Michigan National Bank for the purpose of acquiring a loan from the Bank. The financial statement listed as jointly held assets, a residence worth $150,000 (equity of $50,000) and personal property worth $150,000. Based on this financial statement, the Bank loaned funds to the Newmans on two occasions. In 1991, the Newmans filed a Chapter 7 bankruptcy petition in which they valued their personal property at $3,850. On May 10, 1991, the Bank filed a complaint in the bankruptcy court seeking to except from discharge the loans it had made to the Newmans, which amounted to over $150,000 including interest.
 
 
 3
 At his deposition in the bankruptcy case, Paul Newman explained that the $150,000 valuation of his family's personal property was his estimate of the replacement cost of that property. He testified that the $150,000 was for "our furniture, personal belongings, clothing, everything we had, our household goods and that sort of thing." He also testified that a friend and investment partner, Mr. DeLisle, had told him that the $150,000 valuation of his personal property sounded fine.
 
 
 4
 The bankruptcy court held a bench trial on February 18, 1992, and in an oral decision issued that day, the court granted judgment for the debtors. The bankruptcy court first made the following findings of fact: (1) Paul Newman's recklessness as to the truth or falsity of his valuation was sufficient to satisfy the intent to deceive element of § 523(a)(2)(B)(iv); (2) the written statement was "material" as required by § 523(a)(2)(B)(i); and (3) the Bank relied upon the Newmans' financial statement, meeting the requirements of § 523(a)(2)(B)(ii) and (iii).
 
 
 5
 The bankruptcy court found the crucial issue to be whether the Bank had put on sufficient evidence for a finding that the $150,000 valuation was actually false. The court found only two pieces of evidence that tended to show the statement was false: the inference that could be drawn from comparing the $150,000 valuation in 1987 with the $3,800 valuation in 1991, and Paul Newman's statement that he had not sold or traded away any of his personal property since 1987. Paul Newman never admitted $150,000 was a false valuation; he only said that the figure was a rough estimate of the replacement cost of his personal property. The Bank never introduced any evidence as to what the items being valued at $150,000 were; it simply relied on the inference that could be drawn from the discrepancy between the two different valuations. The court concluded that while Paul Newman may have completely guessed at the value of his possessions, this did not prove the statement was false. It reasoned that the 1987 figure might be true and the 1991 figure false; or, both figures might be true and the difference in value accounted for by depreciation, consumption, etc. The court held that the mere inferences upon which the Bank was asking the court to rely were insufficient to carry the Bank's burden of proof as to the falsity of the statement. The court thus entered judgment in favor of the Newmans. The Bank appealed to the district court and the district court affirmed on July 29, 1992. This appeal followed.
 
 II
 
 6
 A. Debts Incurred Using Fraudulent Financial Statements Not Dischargeable
 
 
 7
 The general rule of Chapter 7 bankruptcy is that a bankruptcy debtor's preexisting financial obligations are discharged, and the debtor begins with a clean financial slate. However, several exceptions to the general rule exist, and among these is 11 U.S.C. § 523(a)(2)(B), which excepts from discharge any debt obtained by the submission of a false financial statement. Specifically, § 523(a)(2)(B) provides that a debt is not dischargeable to the extent obtained by--
 
 
 8
 (B) use of a statement in writing--
 
 
 9
 (i) that is materially false;
 
 
 10
 (ii) respecting the debtor's ... financial condition;
 
 
 11
 (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
 
 
 12
 (iv) that the debtor caused to be made or published with intent to deceive; ...
 
 
 13
 To avoid the effect of a discharge, the burden is upon the creditor to prove that the debt falls within the exception claimed. Hill v. Smith, 260 U.S. 592 (1923). A § 523(a)(2)(B) exception must be established by the creditor by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279 (1991).
 
 B. Standard of Review
 
 14
 We must first determine what standard of review is to be used in determining whether the bankruptcy court erred in finding that the evidence offered failed to satisfy the burden of proof. It is axiomatic that findings of fact are reviewed for clear error and legal conclusions are reviewed de novo. The question of whether a particular set of facts satisfies (or fails to satisfy) the requisite burden of proof is an inseparable part of the factfinding process and as such is reviewed--together with the facts--for clear error. See 1 Steven A. Childress & Martha S. Davis, Federal Standards of Review § 2.18, at 2-130 (2d ed. 1991) ("[T]he actual application of law to facts to see whether a particular set of evidence rises up sufficiently to meet the test ... is just the fact-finding process, not law-making; it should be reviewed for clear error.")
 
 C. Analysis
 
 15
 The only question before us is whether the Bank offered sufficient proof that the statement of financial condition was false. The Bank argues that the financial statement submitted by the Newmans was materially false because Paul Newman used replacement cost instead of fair market value in calculating the value of the family's personal property. The bankruptcy court agreed that the use of replacement cost could result in a valuation which was false, i.e., a valuation which failed to reflect the fair market value of the property. The court also found that Paul Newman's use of replacement value in this case was "reckless" and thus satisfied the intent to deceive element of § 523(a)(2)(B)(iv). However, the court found insufficient proof that the valuation was in fact false (and not just probably false) and held that the debt did not come within § 523(a)(2)(B).
 
 
 16
 When a creditor requests information regarding personal assets from a debtor, the creditor is generally only interested in "fair market value" in order to determine whether sufficient equity exists to be able to recover from the debtor in the event of a default.[1] Replacement cost, historical cost, and other valuation methods are generally not useful to the creditor; these have little relation to an asset's liquidation value, the primary concern of a creditor. However, valuing an asset at its replacement cost is not per se a false valuation, because an asset may have a fair market value equal to its replacement cost. So, it is not a deductive truth that Paul Newman's use of replacement cost resulted in a false valuation. The court correctly found that without identification of the allegedly overvalued assets, it could not determine that the financial statement was in fact false, because the statement might have been true, albeit accidentally, depending on what the assets being valued were.
 
 
 17
 Similarly, Paul Newman's recklessness in valuation is not a guarantee that the statements were false. Making a statement of value without knowing the actual value of an object is not necessarily a false statement; it is only false if the guess is wrong. To carry the burden of proof, a creditor may not rely on generalized probabilities that a debtor's use of replacement value is wrong.
 
 
 18
 The cases which the Bank cites in support of its appeal fall into two major categories. The first category is cases which discuss the definition of "materially false."[2] See Fifth Third Bank of Toledo v. Frugh (In re Frugh), 133 B.R. 870 (Bankr.N.D.Ohio 1991); Jaress Truck Ctrs., Inc. v. Hodges (In re Hodges), 116 B.R. 558 (Bankr.N.D.Ohio 1990); Merchants Nat'l Bank v. Denenberg (In re Denenberg), 37 B.R. 267 (Bankr.D.Mass.1983); American Bank and Trust Co. v. Drewett (In re Drewett), 13 B.R. 877 (Bankr.E.D.Pa.1981); HCC Consumer Discount v. Tomeo (In re Tomeo), 1 B.R. 673 (Bankr.E.D.Pa.1979). None of these cases answers the narrow question on appeal here. The question before us is not whether the bankruptcy court applied the correct definition or standard of material falsity; the issue is whether the bare bones proof in this case could support a legally justified inference that the valuation was in fact false. The bankruptcy court did not even reach the question of how to define "materially false," because it did not, in the first place, receive evidence that the financial statement was in fact false.
 
 
 19
 We do not mean to imply that the Bank bore the onerous burden of identifying each item of personal property and proving its value at the time the financial statement was submitted. The burden of proof may be satisfied with the aid of reasonable inferences. For example, if the Bank had simply deposed Paul Newman as to what items composed the personal property worth $150,000 and asked whether any of these items had a collectors value or had increased substantially in value (to which Newman would presumably have answered no), the Bank could have made out a claim. But for the Bank simply to rely on the inference to be drawn from the difference in valuations and the debtor's extremely general description of the property, left the court to pure speculation; this kind of speculation cannot, as a matter of law, meet the preponderance of evidence standard.
 
 
 20
 The Bank also cites cases regarding the improper use of replacement or cost valuation. See National Bank v. Bonnett (In re Bonnett), 73 B.R. 715 (C.D.Ill.1987), rev'd, 895 F.2d 1155 (7th Cir.1989); In re Frugh; Fentress County Bank v. Lambert (In re Lambert), 64 B.R. 170 (Bankr.E.D.Tenn.1986); First Safety Fund Nat'l Bank v. Valley (In re Valley), 21 B.R. 674 (Bankr.D.Mass.1982); In re Tomeo. We do not quarrel with the fact that these cases hold, or at least imply, that replacement cost often leads to an exaggerated valuation of assets. However, each of these cases can be distinguished from the instant case in that each court had before it evidence of what the allegedly overvalued asset was and what the asset was actually worth at the time the debtor filed the financial statement. See Bonnett (historical cost given for turkeys; court took testimony concerning the actual market value of the turkeys from two bankers, the debtor, and debtor's accountant); Frugh (debtor admitted using cost method to value certain pieces of medical equipment and conceded that resale value would be a fraction of the purchase cost); Lambert (among many items whose value was found to be fraudulently misrepresented, court considered debtor's claim that personal property was worth $29,000 when same property was listed on bankruptcy schedules at $1,425; court rejected debtor's testimony that the $29,000 figure included property of wife and daughter, whereas $1,425 figure did not, and further found that as a banker, debtor was familiar with financial statements, knew what was required, and yet included obviously false valuations on his financial statement); Valley (alleged overvaluation of house; court heard testimony regarding value from three appraisers, the bank, and the debtor); Tomeo (household furniture claimed to be worth $5,000; debtor admitted the market value of the furniture was far less than $5,000).
 
 
 21
 In sum, the failure of the Bank to put on any evidence regarding the identity or the 1987 value of the allegedly overvalued assets created a fatal void in the proofs necessary to carry the Bank's burden.
 
 III
 
 22
 For the foregoing reasons, the district court is AFFIRMED.
 
 
 
 [1]
 The financial statement completed by Paul Newman did not specify that the assets should be valued at fair market value, but it is reasonable to assume that this is what the Bank wanted
 
 
 [2]
 A few of these cases also discuss the "reasonable reliance" and "intent to deceive" elements. The Bank does not challenge the bankruptcy court's favorable findings on these issues, so we do not discuss these aspects of the cases