In re Mitchell B. ROBBINS, Debtor.

Abdellah BENJELLOUN, Plaintiff,

v.

Mitchell B. ROBBINS, Defendant.

Bankruptcy No. 90–40181–JFQ.
Adv. No. 90–4241.

United States Bankruptcy Court,
D. Massachusetts.

Jan. 9, 1995.

William F. Macauley, Craig and Macauley, Boston, MA, for Mitchell B. Robbins.

Kevin C. McGee, Seder & Chandler, Worcester, MA, for Abdellah Benjelloun.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

Abdellah Benjelloun (the "Plaintiff") seeks a declaration that the $325,000 indebtedness allegedly owed him by Mitchell Robbins (the "Debtor") is nondischargeable under section 523(a)(2) of the Bankruptcy Code, which concerns debt obtained by use of a false financial statement. The Debtor moves for summary judgment. The Plaintiff also moves for summary judgment on all aspects of the case except the issue of the Debtor's fraudulent intent. Both motions are supported by affidavits incorporating deposition testimony. I have taken the matter under advisement after a hearing on the motions.

The factual background is undisputed. In June of 1988, the Debtor, through a trust, purchased for $2,330,000 a so-called "strip mall" known as Warner Shops Plaza, located at 284–286 Winthrop Street, Taunton, Massachusetts. The purchase was financed by a bank mortgage of $2,100,000 which the Debtor guaranteed. On December 28, 1988, the Plaintiff and the Debtor formed a limited partnership under an agreement of that date entitled "Certificate of Limited Partnership and Warner Shops Limited Partnership Agreement." The partnership then purchased the property for $2,425,000 through payment of $325,000 in cash and assumption of the trust's obligation on the mortgage of approximately $2,100,000. The Debtor continued to remain sole guarantor of the debt. The Plaintiff became the sole limited partner, having paid $325,000 for his interest represented by 100 partnership units. The Debtor and Robbins Management Co., Inc., a company wholly owned by the Debtor, became the general partners, with the Debtor receiving 95 partnerships units and the Debtor's corporation receiving 5 partnership units.

Until the Plaintiff's $325,000 investment had been paid back to him, he was to receive the first $32,500 of annual cash flow, with any excess to be allocated 50% to the Plaintiff and 50% to the general partners. Following its provisions on annual cash flow, the partnership agreement contains these additional sections concerning return of the Plaintiff's $325,000 capital contribution:

Section 7.6 *Sale, Refinancing and Terminating Transactions.* Net cash, proceeds of Sale, Refinancing and Terminating Transactions shall be distributed as follows;

a) First to the Limited Partner(s) as a class, until they have received a return of their total Capital Contribution;

b) Second to the General Partners as a class until they have received a return of their total Capital Contribution;

c) Then any remaining net cash proceeds shall be distributed, 50% to the General partners as a class and 50% to the Limited Partner(s) as a class.

**Section 7.7** *General Partner Terminating Capital Requirement.* The General Partner shall make a capital contribution upon termination of the Partnership equal to the amount required, after giving effect to section 7.6(a) above, so that the Limited Partner(s), receive as a class, a return of their capital contribution.

The Plaintiff has received no return of capital. The partnership having been dissolved pursuant to the Debtor's confirmed plan of reorganization, the Plaintiff now seeks to have declared nondischargeable the Debtor's obligation to return the Plaintiff's $325,000 capital contribution pursuant to these provisions of the partnership agreement.

During the parties' negotiations in December of 1988, the Debtor furnished the Plaintiff with a personal financial statement dated July 31, 1988. This was done because of the Plaintiff's concern that the Debtor have the financial resources to support his obligation under section 7.7 of the partnership agreement. The financial statement, which runs to 26 pages, shows assets valued at $51,649,388.00 and liabilities of $23,982,520.00, with a net worth of $27,666,868.00. The defendant's extensive real estate investments are valued on the financial statement at $37,524,131.

The Plaintiff's complaint, as unartfully amended by a pleading entitled in part "Expanded Allegations", contains two counts. In Count I, the Plaintiff alleges that the $325,000 debt is nondischargeable under section 523(a)(2)(B) of the Code, which applies to debts for money obtained by the use of a materially false and intentionally fraudulent written statement with respect to the debtor's financial condition. In Count II, the Plaintiff relies in part upon a different writing furnished him by the Debtor that relates only to Warner Shops Plaza, which is entitled "Summary of Proposed Investment." The Plaintiff alleges that in this writing the Debtor or fraudulently misrepresented the value and net worth of Warner Shops Plaza. He refers to this writing as a "Financial Statement." In his "Expanded Allegations," the Plaintiff adds to Count II allegations that the Debtor and his employees represented that Warner Shops Plaza had "good tenants," whereas four of the nine tenants were behind in their rent and one of these had been told by the Debtor to vacate the premises. Count II nevertheless still refers only to section 523(a)(2)(B) pertaining to false written statements concerning a debtor's financial condition.

## I. EXISTENCE OF "DEBT" OWED BY DEBTOR TO PLAINTIFF

Section 523(a)(2)(B), whose provisions are fully quoted later, operates to prevent the discharge of an individual debtor from the type of "debt" described therein. The Debtor contends the statute has no application here because the only debt arguably owed the Plaintiff under the partnership agreement is owed by the partnership and not by the Debtor.

The obligations of the Debtor and his corporation under the partnership agreement are expressly made their joint and several obligations by section 12.15 of the agreement. Upon termination of the agreement, which has occurred, under section 7.7 the Debtor obligated himself to make a capital contribution "equal to the amount required, after giving affect to section 7.6(a) above, so that [the Plaintiff] receive[s] ... a return of all [his] Capital Contribution." I agree with the Debtor that this language, when read with the preceding section 7.6(a), requires him to pay $325,000 to the partnership. But that payment was obviously to be earmarked for the Plaintiff and was to pass quickly through the partnership to him. The obligation is therefore owed, in substance, to the Plaintiff.

The Debtor's obligation is somewhat similar to that owed to a third party beneficiary under a contract to which the beneficiary is not a party. Massachusetts recognizes the right of either a creditor or donee beneficiary to enforce a contract. *See Rae v. Air–Speed, Inc.,* 386 Mass. 187, 435

N.E.2d 628 (1982); *Choate, Hall & Stewart v. SCA Services, Inc.*, 378 Mass. 535, 392 N.E.2d 1045 (1979); *see also Restatement of Contracts (Second)* §§ 302, 304 (1981). Massachusetts law controls here; it is the place of contracting, the location of the property, the residency of the Debtor and the jurisdiction in which the partnership obtained its legal existence. *Id.* Here the Plaintiff was a party to the contract as well as the one who was in substance the beneficiary of the Debtor's obligation. Surely the Massachusetts courts would give the Plaintiff a cause of action against the Debtor.

The Debtor's obligation is a debt notwithstanding its relationship to capital. As an obligation to return capital, it creates a "debt" which is merely a "right to payment." *See* 11 U.S.C. §§ 101(5), (12) (1988).

## II. *DEBTOR'S FINANCIAL STATEMENT (COUNT I)*

Section 523(a)(2)(B) provides:

(a) A discharge under 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

. . . . .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

11 U.S.C. § 523(a)(2)(B) (1988).

### A. *Reasonable Reliance*

▪ The statute requires, first, that there be actual reliance upon the financial statement, and, second, that the reliance be reasonable. *Marx v. Reeds (In re Reeds)*, 145 B.R. 703, 707 (Bankr.N.D.Okla.1992). The Debtor contends there was neither actual nor reasonable reliance by the Plaintiff because the Plaintiff read only two pages of the twenty-six page financial statement. But the two pages which the Plaintiff read were the pages that summarized the Debtor's financial condition and showed a net worth of $27,666,868. That net worth is what the Plaintiff relied upon. It was not unreasonable for him to forego leafing through the minutia contained in the numerous other pages. Moreover, the Plaintiff's attorney and accountant both looked at these more detailed pages and communicated to him any further knowledge they obtained.

The affidavits supporting the Plaintiff's motion indicate the Plaintiff's concern that the Debtor had the financial strength to back up his obligation to return the Plaintiff's capital investment. The affidavits, in summary, make out a case of actual and reasonable reliance.

### B. *Material Falsity*

The July 31, 1988 financial statement showed assets having a total value of $51,649,388 and contained the following subcategories with supporting exhibits:

| | |
|---|---|
| Cash and other current Assets | $ 5,160,257 |
| Individual condominium units | 9,808,400 |
| Land | 17,340,000 |
| Apartment Complexes | 6,729,145 |
| Shopping Centers | 3,646,586 |
| Cash Deposits & other assets | 8,965,000 |
| Total Assets | $51,649,388 |

The Plaintiff asserts that the financial statement was materially false for a number of reasons. First, the Plaintiff points to a note to the financial statement which reads: "Market values for real estate have been determined by both independent appraisals and comparison of each respective real estate holding to recent sales of similar real estate located near each real estate holding." The Plaintiff's lawyer professes by affidavit to have read and relied upon this statement. The Plaintiff contends it is false because the Debtor admits that many of the values represent his own estimate of value. For example, the $6,729,145 value of the apartment complexes is based upon the Debtor's own estimate of what the aggregate sales price would be if he converted the complexes to condo-

miniums and sales were made of individual condominium units. In July of 1988 he had no present plans to convert any apartment complex to a condominium. As another example, he valued his numerous individual condominium units at a total value of $9,808,-400 based also on his own estimate of value. In some instances, however, values on the financial statement were based upon independent appraisals. Perhaps ironically, one instance of this is Warner Shops Plaza, which had been independently appraised at $2,500,-000.

Second, the Plaintiff asserts the financial statement was materially false because the Debtor's opinion of values appearing therein went far beyond "mere puffery." The Plaintiff attacks the comparable sales figures used by the Debtor in support of his values, asserting the properties which were the subject of these sales were totally different. The Plaintiff is especially critical of the Debtor for having valued apartment complexes at the aggregate of the value of the apartments if the properties were converted to condominiums and sales were made of individual condominium units. The Plaintiff attacks the raw land values totaling $17,340,000. The Debtor computed these values based upon the aggregate of lot values when development was completed. The Plaintiff also criticizes the Debtor for having valued a New Hampshire shopping mall by capitalizing its potential income stream rather than its present rental incomes.

At the core of Plaintiff's attack on the July 31, 1988 financial statement is the difference between its net worth of $27,666,868 and the $4,062,398.33 negative net worth shown on the Debtor's bankruptcy schedules filed in connection with his chapter 11 filing of February 14, 1990. Some, but not all, of this difference is caused by property being valued at significantly lower amounts. Often the lower values were arrived at through use of a different appraisal technique. For example, apartment complexes were valued through capitalization of income rather than by totaling the market values of individual units assuming a conversion to condominiums.

None of this make the financial statements materially false. I agree with the Plaintiff

that the note to the financial statement stating that values had been determined by "both" independent appraisals and comparative sales prices is a statement that each property had been independently appraised. If the note was intended to mean only some properties had been independently appraised, the word "either" instead of "both" should have been used. But under the statute, the truth or falsity of a financial statement depends upon its description of the Debtor's "financial condition," not on how that financial condition was determined. Valuations were for the most part based upon the Debtor's opinion. Those values must therefore be tested by the standard applicable to a debtor's opinion of values appearing on a financial statement.

An opinion of asset valuation in a financial statement falls outside section 523(a)(2)(B), despite the opinion's inaccuracy, so long as there is a foundation for the opinion. *Bombardier Credit, Inc., v. Calvo (In re Calvo),* 111 B.R. 1003 (Bankr.M.D.Fla.1990). The court in *Calvo* explained,

> [T]he valuation of assets on a loan application is the declarant's subjective opinion, and there is generally no basis to infer fraud if the valuation turns out to be incorrect. However, when the valuation is so completely without foundation, one can only conclude that the valuation was beyond mere puffery, and instead was stated for the primary purpose of inducing the lender to lend money to the applicant.

*Id.,* 111 B.R. at 1006. *See also Fields v. Nemovitz (In re Nemovitz),* 142 B.R. 472 (Bankr.M.D.Fla.1992); *Fifth Third Bank of Toledo v. Frugh (In re Frugh),* 133 B.R. 870 (Bankr.N.D.Ohio 1991); *Chase Manhattan Fin. Serv., Inc. v. Warmack (In re Warmack),* 88 B.R. 399 (Bankr.M.D.Fla.1988). *Cf. Oppenheimer v. Reder (In re Reder),* 60 B.R. 529 (Bankr.D.Minn.1986) (financial statement materially false where it incorrectly stated value of automobile—without any discussion of lack of foundation).

In the present case, the Debtor had a foundation for his opinion of values with respect to apartment complexes. That foundation was an assumed conversion of the complexes into condominiums. With respect to

raw land, the foundation consisted of anticipated development activities on the properties. In the 1980's condominium conversions were common and developments were proceeding apace. With respect to the New Hampshire shopping center, it was the center's potential rental stream. One might criticize these opinions as an unconservative approach to valuation. That criticism, however, is legitimate only for cross examination of an expert so opining, and I have seen many such cross examinations. It falls far short of establishing fraud.

The Debtor's valuations must be considered in the context of the state of the Massachusetts economy in mid–1988. It is common knowledge that Massachusetts real estate values tumbled dramatically during the 1988–1992 period. As the result of excessive construction of both residential and commercial properties, by July 31, 1988 the supply of all types of real estate far exceeded the demand for their purchase. Yet that fact had not then sunk into the public consciousness. A comparison between a valuation opinion of July 31, 1988 and one as of the bankruptcy filing of February 14, 1990 (and made several months later) simply demonstrates this sharp market decline. It certainly does not establish the rendering of a fraudulent opinion, either alone or in conjunction with the rest of the Plaintiff's proffered evidence.

■ A financial statement will not be held materially false due to subsequent events which make the statement inaccurate at some later time. *Public Employees Retirement Sys. v. Gadus (In re Gadus),* 145 B.R. 235, 237 (Bankr.N.D.Ohio 1992); *ITT Commercial Finance Corp. v. Walz,* 115 B.R. 353, 357 (Bankr.N.D.Fla.1990) (statement not materially false when difference in values listed on the financial statement and petition two years later was due to different methods of valuation and dissipation of assets); *Federal Deposit Ins. Corp. v. Cerar (In re Cerar),* 84 B.R. 524, 532 (Bankr.C.D.Ill.1988), *aff'd on different grounds,* 97 B.R. 447 (C.D.Ill.1989) (financial statement not materially false when substantial difference in values listed on statement given 29 months later was due to the variety of events which could have oc-

curred in this amount of time); *First Hardin Nat'l Bank & Trust v. Rosel (In re Rosel),* 63 B.R. 603, 606 (Bankr.W.D.Ky.1986) (financial statement not materially false when statement of income was future projection that did not materialize). *Cf. First Alabama Bank v. Bagwell (In re Bagwell),* 125 B.R. 306, 309 (Bankr.N.D.Ala.1991) (financial statement materially false when another financial statement given six months later showed decline in value of real estate at 54% and personalty at 87% despite debtor's explanation that both sales of assets and a general decrease in value had occurred in the interim).

■ In sum, an opinion of value on a financial statement may be materially false if it is so completely without foundation that one can only conclude the valuation went beyond mere puffery. That is not the situation here.

### III. ALLEGATIONS OF COUNT II

■ Count II, as initially framed, relied solely upon a document entitled "Summary of Proposed Investment" which the Debtor prepared and delivered to the Plaintiff in December of 1988. This contained information on only Warner Shops Plaza. The document valued the real estate at $2,500,000. The Plaintiff alleges the property was actually worth $1,800,000, the amount shown on the Debtor's bankruptcy schedules. Count II describes the document as a "Financial Statement" and requests relief under section 523(a)(2)(B) pertaining to false financial statements.

Count II fails because the document entitled "Summary of Proposed Investment" does not come within the scope of section 523(a)(2)(B). It is not, in the words of the statute, a "statement in writing ... respecting the debtor's ... financial condition." It relates only to a particular property. Moreover, for the reasons set forth in the discussion of Count I, the document was not materially false. Indeed, the valuation contained in it was based upon an independent appraisal.

■ In his amendment to the complaint, the Plaintiff expands Count II to contain

allegations the Debtor through his employees falsely represented that the tenants of Warner Shops Plaza were "good tenants," whereas four of the nine tenants were behind in their rent and one of these had been notified by the Debtor to vacate. Here Count II goes further afield of section 523(a)(2)(B), even though it purports to be still based upon that subsection. Apparently recognizing this, the Plaintiff in his cross-motion for summary judgment cites section 523(a)(2)(A). This subsection applies to debts for money obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A) (1988).

 The allegations in the amended complaint of false representation concerning "good tenants" may fall within the coverage of subsection (A). The difficulty is they come too late. For a debt to be nondischargeable under either subsection (A) or (B), a complaint to establish its nondischargeability must be filed with this court no later than sixty days following the first date set for the meeting of creditors held pursuant to section 341(a). 11 U.S.C. § 523(c)(1) (1988); Fed.R.Bankr.P. 4007(c). The Plaintiff did not amend his complaint until long after this sixty-day period had expired. Amendment of a complaint to assert a new cause of action is the equivalent, for statute of limitation purposes, to the filing of a new complaint on that cause of action. *See O'Loughlin v. National R.R. Passenger Corp.*, 928 F.2d 24 (1st Cir.1991).

I permitted no such late filing. These so-called "Expanded Allegations" were filed in response to my direction at a pretrial that the Plaintiff make more specific allegations as to the falsity of the July 31, 1988 financial statement. I had no intention of permitting a new count based upon subsection (A). Moreover, any motion requesting permission to file a complaint beyond the sixty-day period must be filed within the sixty-day period. Fed.R.Bankr.P. 4007(c). That did not occur.

## IV. CONCLUSION

Summary judgment is to be granted if the pleadings and other documents on file, including any affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Bankr.P. 7056. Summary judgment is properly entered against the party who bears the burden of proof at trial if that party fails to make a showing sufficient to establish the existence of an element essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106, 2548, 2552, 91 L.Ed.2d 265 (1986). In the instant case, the Plaintiff has failed to make a showing that the financial statement in question was materially false. His attempt to establish fraud unrelated to the financial statement came too late. Therefore, summary judgment is to be granted in favor of the Debtor.

A separate judgment has been entered.