In re William A. ALICEA, Debtor.

Frederic C. Weiss, Plaintiff,

v.

William A. Alicea, Defendant.

Bankruptcy No. 98 B 41341(SMB).
Adversary No. 98/8604A.

United States Bankruptcy Court,
S.D. New York.

Feb. 22, 1999.

Frederic C. Weiss, Brooklyn, NY, plaintiff pro se.

Zivyak Klein & Liss, LLP, Jeffrey L. Zivyak, of counsel, New York City, for defendant.

### MEMORANDUM DECISION DETERMINING DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

STUART M. BERNSTEIN, Bankruptcy Judge.

The plaintiff, an attorney, formerly represented the debtor, William A. Alicea. He also invested in one of Alicea's real estate deals. The plaintiff filed this adversary proceeding contending that his unpaid legal fees and lost investment should be declared nondischargeable. Alicea moved to dismiss the amended complaint on the grounds that it fails to state a claim upon which relief can be granted, and is time-barred. For the reasons that follow, the motion is granted in part and denied in part.

### BACKGROUND[1]

#### A. Unpaid Legal Fees

The plaintiff represented Alicea and certain of his affiliated entities in real estate-related transactions between June 1987 and October 1990. The plaintiff's legal fees generally went unpaid, and the parties discussed the unpaid legal bills and their payment often. (Amended Complaint ¶¶ 5–6.) Alicea told the plaintiff that he did not have the money to pay the fees and expenses because all of his funds were tied up in the Bradley Avenue and Van Name projects, two real estate development deals owned and run by

---

1. The facts are taken from the amended complaint, and are deemed to be true for the purpose of the motion.

Alicea's affiliates. (*Id.*, ¶ 9.) Alicea assured the plaintiff that the legal fees would be paid from the closing proceeds generated by future sales of residential homes built in connection with these projects. (*Id.*, ¶¶ 6–8, 13.)

Many of the contractors working on the projects had also not been paid. As a result, they filed mechanics liens. Prior to each closing on the sale of numerous Bradley units between August and December 1988, Alicea advised the plaintiff that he needed the proceeds to satisfy mechanics liens. He assured the plaintiff, however, that he had " 'cleared up' most of the debts to the subcontractors and materialmen, and would have enough funds from future closings to pay his legal fees." (*Id.*, ¶¶ 17–18.) Based on these assurances, the plaintiff continued to provide legal services.

By January 1, 1990, Alicea and his affiliates had incurred legal fees and expenses totaling $95,000.00, which increased to $124,-225.00 by February, 1991. (*Id.*, ¶ 19.) Only $12,200.00 was ever paid. (*Id.*) To induce the plaintiff to continue working, Alicea and his partner, Kevin Love, personally guaranteed all of the legal fees due and to become due. They never honored the guarantees, and still owe $112,025.00.

## B. The Real Estate Investment

On or about June 15, 1987, Alicea's affiliate, Metro–East Associates ("Metro–East"), agreed to purchase property located in Easthampton, New Jersey for $1,635,000.00. The transaction required approximately $400,-000.00 in cash; Metro–East would give the seller a purchase money mortgage in the sum $1,245,000.00 for the balance. (Amended Complaint ¶ 22.) Alicea induced the plaintiff to invest $100,000.00 personally in the deal. (*Id.*, ¶¶ 23, 26.) He told the plaintiff that he and Love had received offers from prospective purchasers. They planned to "flip" the purchase within a few months of the closing

and well before the periodic balloon payments became due under the mortgage. Alicea also told him that the closing proceeds from the Bradley Avenue and Van Name developments would be sufficient, if needed, to make the mortgage payments, omitting that he had already pledged those same proceeds to pay contractors and satisfy mechanics lienors. Finally, and again if needed, Alicea and Love would use their personal assets to pay the mortgage. (*Id.*, ¶¶ 25–26.)

Based upon these representations, the plaintiff invested the entire $100,000.00 at the closing. (*Id.*, ¶ 26.) Within only three months, however, Alicea permitted the mortgage to go into default. (*Id.*, ¶¶ 27, 30b [2].) Instead of paying the mortgage from his personal assets, Alicea breached his fiduciary duty to the plaintiff, and invested approximately $150,000.00 of personal assets in another venture. (*Id.*, ¶¶ 28, 30b.)

At a November 1989 meeting, the plaintiff learned that the Easthampton mortgage had been foreclosed.[3] Alicea, Love and Metro–East acknowledged that they had breached their obligations to the plaintiff, and Alicea agreed to repay the $100,000.00 because he and Love had not held up their end of the deal. (*Id.*, ¶¶ 29–30a.). They never did pay, and the plaintiff never recovered his investment.

## C. The Settlement Agreement

The plaintiff stopped representing Alicea and his affiliates in October 1990.[4] He retained the files regarding the Van Name units that had not closed, pending payment of his legal fees. (Amended Complaint ¶ 34.) Between October 1990 and April 1991, the parties met to negotiate a pay-out. (*Id.*, ¶ 32.) Alicea represented, at the time, that he had full authority to reach agreement on behalf of himself and Love. (*Id.*, ¶ 33.)

**2.** The amended complaint contains two paragraphs numbered "30." One appears on page 11 and the other on page 12. The opinion refers to the first as "30a" and the second as "30b."

**3.** Metro–East apparently managed to restructure the mortgage debt. Eventually, it breached the restructuring agreement and lost title to the

property through foreclosure in 1991. (Amended Complaint ¶ 31.)

**4.** The amended complaint states October "1998." Based upon the timing of the Van Name closings alleged elsewhere, the year should probably be "1990."

Following negotiations, the plaintiff prepared a letter agreement, dated April 11, 1991, memorializing their oral settlement agreement. It provided for the timely repayment of the $100,000.00 investment and an additional $60,000.00 in settlement of the legal fees. (*Id.*, ¶¶ 35, 37.) Alicea and Love would be jointly and severally liable for all payments. (*Id.*, ¶ 37.) The payments would be secured by mortgages on the unsold Van Name units, and upon closing, a portion of the proceeds would be paid to the plaintiff. (*Id.*, ¶ 35.) Alicea represented that no closings would occur unless the proceeds were sufficient to pay the "pledged" payments (initially $750 per unit, increasing to several thousand dollars per unit). This was essential to the plaintiff because he no longer represented the Alicea's entities, and would not be present at the closings. (*Id.*, ¶ 38.)

Based upon the settlement, the plaintiff released the legal files to Alicea. Alicea subsequently failed to provide the requisite block and lot descriptions or execute recordable assignments of proceeds, and never delivered settlement documents signed by Love. (*Id.*, ¶ 39.) Alicea also failed to make payments from the closings (except for one $750.00 payment), or inform the plaintiff that the closings were taking place. In addition, he closed unit sales even though the closings did not generate sufficient proceeds to make the settlement payments. (*Id.*, ¶¶ 39–40.)

## D. The State Court Action

On October 1, 1993, the plaintiff sued Alicea, Love and their entities in state supreme court. (Amended Complaint ¶ 41.) He sought compensatory and punitive damages, contending that the state court defendants had fraudulently induced him into providing legal services (Tenth(B) Cause of Action), investing $100,000.00 in the real estate project in May 1988 (Eleventh Cause of Action) and entering into a settlement agreement that Alicea thereafter breached (Fourteenth Cause of Action). (*Id.*) Alicea defaulted. (*Id.*, ¶ 45.) The state court entered a default judgment on certain of the plaintiff's liquidated claims, severed the unliquidated causes of action, including the Tenth(B), Eleventh

and Fourteenth, and scheduled an inquest. (*Id.*, ¶ 47.)

Following the inquest, the state court awarded judgment on the Tenth(B) cause of action in the sum $112,025.00, on the Eleventh cause of action in the sum of $100,000.00, and on the Fourteenth cause of action in the sum of $159,250.00. The court also awarded $250,000.00 in punitive damages on all three causes of action. (Amended Complaint ¶ 48.)

## DISCUSSION

### A. Relation Back

Initially, Alicea contends that the amended complaint is time-barred because the claims do not relate back to the original complaint. Under Fed.R.Civ.P. 15(c)(2), an amended pleading "relates back" to an earlier pleading if the amended pleading sets forth claims arising out of the same conduct, transaction or occurrence set forth or attempted to be set forth in the earlier pleading. "The principal inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party 'by the general fact situation alleged in the original pleading.'" *In re Chaus Sec. Litig.*, 801 F.Supp. 1257, 1264 (S.D.N.Y.1992) (quoting *Contemporary Mission, Inc. v. New York Times Co.*, 665 F.Supp. 248, 255 (S.D.N.Y.1987), *aff'd*, 842 F.2d 612 (2d Cir.), *cert. denied*, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988)); *accord Rosenberg v. Martin*, 478 F.2d 520, 526 (2d Cir.) (Friendly, C.J.), *cert. denied*, 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973); *Asset Value Fund Ltd. Partnership v. Care Group, Inc.*, 179 F.R.D. 117, 121 n. 3 (S.D.N.Y.1998). New allegations in the amended pleading relate back if they amplify the facts alleged in the original pleading or set forth those facts with greater specificity. *Oliner v. McBride's Indus., Inc.*, 106 F.R.D. 9, 12 (S.D.N.Y.1985); *In re Chaus Sec. Litig.*, 801 F.Supp. at 1264; *see* 3 James Moore *et al.*, *Moore's Federal Practice* § 15.19[2], at 15–82 (3d ed. 1998) ("*Moore's* "). A revised pleading will also relate back if it asserts new legal theories based on the same series of transactions or occurrences. *White v. White Rose Food*, 128 F.3d 110, 116 (2d Cir.1997); *In re Chaus Sec. Litig.*, 801 F.Supp. at 1264; 3 *Moore's* § 15.19[2], at 15–82. Conversely,

the amended complaint will not relate back if it is based on new facts and different transactions. *In re Chaus Sec. Litig.*, 801 F.Supp. at 1264; *The CIT Group/Factoring Mfrs. Hanover, Inc. v. Srour (In re Srour)*, 138 B.R. 413, 418 (Bankr.S.D.N.Y.1992).

■ The allegations in the plaintiff's amended complaint are based upon the same core of operative facts contained in the original complaint, merely adding "meat" to the existing "bones." *See Oliner v. McBride's Indus., Inc.*, 106 F.R.D. at 12–13. The original complaint was based upon three transactions or occurrences: Alicea fraudulently induced the plaintiff to render legal services, (Complaint ¶¶ 5–10), to invest in real estate, (*id.,* ¶ 13), and to enter into the settlement agreement. (*Id.,* ¶ 14.) Further, the original complaint referred to the corresponding causes of action in the state court proceedings. (*Id.* ¶ 21.) Taken together, this was enough to put Alicea on notice of the transactions that formed the substance of the nondischargeability claims. Accordingly, the claims in the amended complaint relate back to the original complaint, and are not time-barred.

**B. The Motion to Dismiss**

■ A court may dismiss a complaint under Fed.R.Civ.P. 12(b)(6) only if it appears beyond doubt that the plaintiff would not be entitled to any type of relief, even if he proved the factual allegations in his complaint. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Harsco Corp. v. Segui*, 91 F.3d 337, 341 (2d Cir. 1996); *Cohen v. Koenig*, 25 F.3d 1168, 1171–72 (2d Cir.1994); *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993), *cert. denied*, 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994). The court must assume the truth of those factual allegations, *Harsco Corp. v. Segui*, 91 F.3d at 341, and draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Luedke v. Delta Air Lines, Inc.*, 159 B.R. 385, 389 (S.D.N.Y.1993); *Raine v. Lorimar Prods., Inc.*, 71 B.R. 450, 453 (S.D.N.Y.1987).

The amended complaint asserts five claims based on fraud and a sixth based on willful and malicious injury. Alicea attacks all of the fraud claims on similar grounds. First, the amended complaint pleads a string of broken promises and optimistic predictions that will not support a fraud claim. *See Kuper v. Spar (In re Spar)*, 176 B.R. 321, 327 (Bankr.S.D.N.Y.1994). Second, the plaintiff does not allege an intent to defraud. Third, all of the alleged misrepresentations relate to the financial condition of Alicea or his affiliates. Hence, they must be in writing, *see* 11 U.S.C. § 523(a)(2)(B), and the oral fraud claims cannot stand.

The plaintiff responds that the claims satisfy the pleading requirements for fraud. Moreover, the state court default judgment is entitled to collateral estoppel effect. The judgment established all of the elements of fraud under New York law. Alicea cannot circumvent the judgment by moving to dismiss claims that the state court necessarily found were sufficient to support its judgment.[5]

The various arguments dictate a general approach to resolving the issues raised by the motion. Initially, I must decide if the claim states a legally sufficient fraud claim, *i.e.,* whether the plaintiff has pleaded an intent to defraud. If it does not, the next inquiry concerns whether the default judgment precludes Alicea from challenging the insufficiency. Finally, I must consider whether an otherwise legally sufficient oral fraud claim relates to Alicea's or his affiliates' financial condition, and hence, is barred under § 523(a)(2)(B) because it is not in writing.

**1. The First Claim for Relief**

The first claim alleges that Alicea made fraudulent misrepresentations concerning his intention and ability to pay the plaintiff's legal fees. First, he said that the fees would be paid from the loan and closing proceeds of the two properties under development. (*See* Amended Complaint ¶ 59.) Second, he would "personally" guarantee payment of the fees.

---

5. The collateral estoppel argument does not affect the bankruptcy law issue of whether a partic-
ular claim relates to financial condition, and is, therefore, covered by § 523(a)(2)(B).

(*Id.*, ¶ 60.) Third, he (or his affiliates, or both) could not currently pay the fees; their assets were committed to the Bradley, Van Name and Easthampton properties. (*Id.*, ¶ 59.)

**a. The Elements of 11 U.S.C. § 523(a)(2)**

Section 523(a)(2) governs determinations of dischargeability where fraud is raised. It excepts a debt from discharge:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (B) use of a statement in writing—
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive.

■■■ Section 523(a)(2)(A) involves actual or positive fraud rather than fraud implied in law. 124 Cong.Rec. H11096 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards); 124 Cong.Rec. S17412 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini). Section 523(a)(2)(B) is an exception to the broad sweep of subsection (A), and the two are mutually exclusive. *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1457 (9th Cir. 1992); *Gehlhausen v. Olinger (In re Olinger)*, 160 B.R. 1004, 1007 (Bankr.S.D.Ind. 1993); *Jokay Co. v. Mercado (In re Mercado)*, 144 B.R. 879, 882 n. 3 (Bankr.C.D.Cal. 1992); 124 Cong.Rec. H11096 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards); 124 Cong.Rec. S17412 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini). Thus, if the fraud involves a statement regarding the

debtor's or an insider's financial condition, it must be in writing.

■■■ We look to the common law of torts, as embodied in the Restatement (Second) of Torts, in construing the elements of § 523(a)(2)(A). *Field v. Mans*, 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir.1997); *In re Apte*, 96 F.3d 1319, 1324 (9th Cir.1996). Section 525 of the Restatement sets forth the elements of fraud:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

*Accord Palmacci v. Umpierrez*, 121 F.3d at 786 (the elements of a common law fraud claim are (1) a false representation, (2) fraudulent intent, or *scienter*, (3) intent to induce reliance, (4) justifiable reliance and (5) damage).

**b. Intent to Defraud**

■■■ As noted, Alicea contends that the plaintiff has failed to plead an intent to defraud. Presumably, he means fraudulent intent, or *scienter*, rather than intent to induce reliance.[6] In this regard, the Restatement observes that a misrepresentation is not actionable unless it is fraudulent, *i.e.*, made with *scienter*. Restatement (Second) of Torts § 526 cmt. a. This means that the defendant must know or believe that his statement is false:

> A misrepresentation is fraudulent if the maker
>
> (a) knows or believes that the matter is not as he represents it to be,
>
> (b) does not have the confidence in the accuracy of his representation that he states or implies, or

---

**6.** I say "presumably" because the intent to influence another's conduct is separate and distinct from fraudulent intent. *See* Restatement (Second) of Torts §§ 525 cmt. a, 531; *Palmacci v. Umpierrez*, 121 F.3d at 786. In any case, the

amended complaint adequately alleges that Alicea made the representations at issue with the intent and for the purpose of inducing the plaintiff to render legal fees, invest the $100,000.00 or turn over his files.

(c) knows that he does not have the basis for his representation that he states or implies.

*Id.,* § 526.

 Although Alicea disagrees, fraud may lie for a misstatement of intention. "A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." Restatement (Second) of Torts § 530(1). *Accord Palmacci v. Umpierrez,* 121 F.3d at 786–87; *Lehman v. Dow Jones & Co.,* 783 F.2d 285, 295–96 (2d Cir.1986); *Soper v. Simmons Int'l, Ltd.,* 632 F.Supp. 244, 249 (S.D.N.Y.1986); *Hotel Constructors, Inc. v. Seagrave Corp.,* 574 F.Supp. 384, 387–88 (S.D.N.Y.1983); *see* Restatement (Second) of Torts § 530 cmt. a ("The state of a man's mind is as much of a fact as the state of his digestion.").

> The test may be stated as follows. If, at the time he made his promise, the debtor did not intend to perform, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made the promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

*Palmacci v. Umpierrez,* 121 F.3d at 787.

 Fraud is not proved merely by showing that the promisor did not perform. *Soper v. Simmons Int'l, Ltd.,* 632 F.Supp. at 249. Intent may be inferred, however, if the promisor knew or believed that he would be financially unable to perform. *Palmacci v. Umpierrez,* 121 F.3d at 789; Restatement (Second) of Torts § 530 cmt. d; *cf. Hotel Constructors, Inc. v. Seagrave Corp.,* 574 F.Supp. at 388 (plaintiff stated fraud claim against defendants who promised to perform construction work for the plaintiff but already had made so many prior contractual commitments to do similar work on other projects that they could not possibly have intended to perform as promised).

 With this background, I return to the first claim. The amended complaint alleges that Alicea knew, when he promised to use the closing proceeds to pay the plaintiff, that they would be insufficient because they were already pledged to pay the lienors and contractors. (*See* Amended Complaint ¶¶ 14, 55, 56.) Similarly, it alleges that Alicea knew when he personally guaranteed the fees that he had already committed his personal assets to other ventures and could not honor his personal guarantee. (*Id.,* ¶ 60.) If Alicea knew or believed when he made each of these promises that he would lack the funds to meet the commitments, his statements of intention were fraudulent.[7]

The fate of the third representation is less clear. Alicea told the plaintiff that he (and his affiliates) lacked the financial wherewithal to pay the legal fees on a current basis. The plaintiff does not really challenge the truth of this statement. In fact, he seems to accept its truth. Rather, he contends that Alicea failed to disclose that the assets were being used for other purposes. (*Id.,* ¶ 59.) The amended complaint, however, does not state or imply that Alicea promised to grant the plaintiff a priority or use the existing assets to pay him. I will nevertheless assume that this third allegation states a fraud claim. Based on the discussion that follows immediately below, the third representation cannot support the plaintiff's nondischargeability claim because it is not in writing.

### c. Statements Relating to Financial Condition

Alicea contends that the oral statements forming the basis of the first claim relate to the financial condition of Alicea or his affiliates. Hence, they must be in writing to support a claim of nondischargeability. 11 U.S.C. § 523(a)(2)(B). The principal interpretive problem with subdivision (B) concerns the meaning of the phrase "statement ... respecting ... financial condition." The term "financial condition" is not defined in the Bankruptcy Code. *Beneficial Nat'l Bank v. Priestley (In re Priestley),* 201 B.R.

---

7. For the reasons discussed in connection with the second claim, *infra,* a fraudulent representa- tion would not affect the dischargeability of debts that arose before the representation was made.

875, 882 (Bankr.D.Del.1996); *In re Olinger*, 160 B.R. at 1007.

Two views have developed. Under the so-called strict interpretation, subdivision (B) is limited to financial-type statements that are sufficient to determine the entity's overall financial responsibility, *Old Kent Bank–Chicago v. Price (In re Price)*, 123 B.R. 42, 45 (Bankr.N.D.Ill.1991), but no specific formality is required. *City Fed. Sav. Bank v. Seaborne (In re Seaborne)*, 106 B.R. 711, 714 (Bankr.M.D.Fla.1989); *see State v. O'Brien (In re O'Brien)*, 110 B.R. 27, 30 (Bankr. D.Colo.1990). These typically include balance sheets, income statements, statements of changes in financial position, or income and debt statements in the case of an individual wage earner, that reflect a person's ability to pay an additional debt. *In re Price*, 123 B.R. at 45; *see In re Kirsh*, 973 F.2d at 1457 (a statement relating to financial condition is one that purports to set forth the debtor's net worth or overall financial position); *Kloven v. Ramsey*, No. 4–92–CV–1249, 1993 WL 181309 at *2 (D.Minn. Apr. 22, 1993) (a statement relating to financial condition is one concerning "overall financial health, net worth, or ability to generate income, as opposed to a statement concerning the status or quality of a single asset or liability"); *D. Nagin Mfg. Co. v. Pollina (In re Pollina)*, 31 B.R. 975, 978 (D.N.J.1983) ("financial statement" may apply to any indication of "net worth," including balance sheets and profit and loss statements in the business context, and statements of weekly wages and existing debts in the individual context); *In re Mercado*, 144 B.R. at 885 (the ordinary usage of a "statement" relating to "financial condition" denotes a representation regarding overall net worth or a person's ability to generate future income); *Bal–Ross Grocers, Inc. v. Sansoucy (In re Sansoucy)*, 136 B.R. 20, 23 (Bankr.D.N.H.1992) ("financial condition," as used in § 523(a)(2)(B), should be given its normal commercial meaning, and refers to an equation of assets and liabilities, *e.g.*, a balance sheet, profit and loss statement or other accounting of an entity's overall financial health, and not a mere statement regarding a single asset or liability); *In re Seaborne*, 106 B.R. at 714 ("Section 523(a)(2)(B) is meant to pertain to a specific type of financial statement, one that specifically states a debtor's or insider's net worth"). By contrast, a statement relating to the financial condition of a single asset does not qualify. *See Benjelloun v. Robbins (In re Robbins)*, 178 B.R. 299, 304 (Bankr. D.Mass.1995); *Resolution Trust Corp. v. Oliver (In re Oliver)*, 145 B.R. 303, 305 (Bankr. E.D.Mo.1992).

■ Proponents of the strict view rely on the language used in the Code, and point to its legislative history. They give "financial condition" its normal commercial meaning and usage. *See In re Pollina*, 31 B.R. at 978; *In re Mercado*, 144 B.R. at 885. Further, the floor statements by Representative Edwards and Senator DeConcini, sponsors of the Bankruptcy Reform Act of 1978, indicate that the exception encompassed the use of the "so-called false financial statement." 124 Cong.Rec. H11096 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards); 124 Cong.Rec. S17412 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini). The sponsors' statements are entitled to weight in considering the interpretation of legislation. 2A Norman J. Singer, *Sutherland on Statutory Construction* § 48.15, at 364 (5th ed.1992).

Finally, the strict view promotes better bankruptcy policy. Virtually any statement concerning an asset or liability arguably relates to financial condition. *See In re Mercado*, 144 B.R. at 883. If drawn too broadly, the definition will sweep in many oral misrepresentations, and therefore exclude them from coverage under subdivision (A). *See Norcross v. Ransford (In re Ransford)*, 202 B.R. 1, 4 (Bankr.D.Mass.1996). These debtors will thereby escape the anti-discharge provisions completely. *See Zimmerman v. Soderlund (In re Soderlund)*, 197 B.R. 742, 746 (Bankr.D.Mass.1996); *In re Olinger*, 160 B.R. at 1011; *In re Oliver*, 145 B.R. at 305–06.

The broad view, on the other hand, defines statements respecting financial condition to encompass "statements concerning the condition or quality of a single asset or liability impacting on the debtor's financial picture." *In re Priestley*, 201 B.R. at 882 (misrepresentation of conditions to purchase of asset, the proceeds of which were pledged to repay

bank loan, impacted the debtor's financial picture and his ability to repay the bank loan); *see Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060, 1060–61 (4th Cir.1984) (representation that debtor owned property free and clear of liens); *Hudson Valley Water Resources, Inc. v. Boice (In re Boice)*, 149 B.R. 40, 46 (Bankr.S.D.N.Y.1992) (statement concerning the ownership of a home); *Connecticut Nat'l Bank v. Panaia (In re Panaia)*, 61 B.R. 959, 960–61 (Bankr. D.Mass.1986) (statement concerning the amount of indebtedness owed to a bank); *Citizens & Northern Bank v. Phillips (In re Phillips)*, 27 B.R. 646, 647 (Bankr.M.D.Pa. 1982) (statement pertaining to encumbrances on assets).[8] Its proponents note that Congress did not speak in terms of financial statements, but instead, referred to a much broader class of statements relating to financial condition. *In re Van Steinburg*, 744 F.2d at 1060–61; *accord In re Boice*, 149 B.R. at 46.

 The arguments supporting the strict view are more persuasive. They are consistent with ordinary usage and faithful to the intent of Congress as reflected in the statements of the sponsors. Moreover, the strict view better reflects the limited purpose that subdivision (B) was intended to serve. Subdivision (B) and its predecessors (dating back to 1903) were designed to protect debtors from abusive lending practices. Consumer finance companies sometimes coaxed potential borrowers into submitting incomplete financial information in the inadequate space provided in the lender's disclosure form. The lender then induced the borrower to certify the completeness of the information.

The form also contained a provision that the lender relied on the form in granting the loan, although the lender had access to credit information to verify the debts listed. Following bankruptcy, the lender used the incomplete financial statement to support a challenge to the dischargeability of the debt based upon fraud. *Field v. Mans*, 516 U.S. at 76–77 & n. 13, 116 S.Ct. 437; H.R.Rep. No. 95–595, at 130–31 (1977); *see* 2 David G. Epstein, *et al., Bankruptcy* § 7–26, at 342 (1992) ("Epstein").

This practice gave the lender leverage to extract a settlement or reaffirmation, despite a weak case, from a debtor intent on avoiding litigation costs. H.R.Rep. No. 95–595, at 131 (1977). Section 523(a)(2)(B) (and its predecessors), together with § 523(d), were intended to reduce the pressure on the honest debtor to settle. *Id.* The lender must defend the adequacy of its lending form in the comparatively debtor-friendly bankruptcy court. 2 Epstein § 7–26, at 342. Under § 523(d), the prevailing debtor may recover costs and attorneys fees from the creditor.[9] Finally, § 523(a)(2)(B) requires proof of reasonable reliance, an objective standard. Hence, the lender's access to other information regarding the debtor's financial condition is relevant.

 Admittedly, section 523(a)(2)(B) is not limited to extensions of credit by consumer finance companies or other lenders. It also applies where the debtor obtains goods or services. Nevertheless, it was designed to deal with a specific problem—tricking the debtor into presenting a false picture of his overall financial condition. Certainly, it was not intended to create an exception that

---

8. Some courts have articulated a third, functional approach which examines the nature of the statement and the purpose for which it is sought and made. *In re Ransford*, 202 B.R. at 4. Where the statement relates only to a single asset or liability, the asset or liability must materially affect the debtor's (or insider's) overall financial condition and be made for the purpose of demonstrating financial wherewithal to pay a debt or perform a contract. *Id.* at 4–5; *In re Mercado*, 144 B.R. at 884. This seems simply to restate the broad view of § 523(a)(2)(B). It considers the materiality of the statement regarding a single asset or liability in determining whether it concerns the debtor's financial condition. Materiality is already an element of the fraud claim.

9. Section 523(d) states:

 If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

swallowed up the general rule in subdivision (A). In this regard, virtually every statement by a debtor that induces the delivery of goods or services on credit relates to his ability to pay. The broad interpretation would permit many dishonest debtors to avoid the consequences of oral fraud. The better rule decides cases on their merits, rather than upon the construction of an ambiguous, statutory phrase that grants a fresh start without regard to the honesty of the debtor.

 Returning to the allegations in the first claim, Alicea's fraudulent misrepresentation that his affiliates would pay the plaintiff's legal fees from the closing proceeds does not relate to their financial condition. Nor does his oral personal guaranty. The first states an intention to pay from a particular source, and at most, implies the value of a single asset. The second does not even refer to Alicea's assets or his financial condition. On the other hand, Alicea's statement that he or his affiliates lacked the present ability to pay is essentially a statement of their insolvency. Insolvency is defined in the Code as a type of "financial condition," 11 U.S.C. § 101(32),[10] and a claim based upon such an oral statement is barred under subdivision (B). *See Chemical Bank v. Sigrist (In re Sigrist)*, 163 B.R. 940, 942 (Bankr.W.D.N.Y.1994) (credit card user's representation regarding ability to pay); *In re Sansoucy*, 136 B.R. at 23 (statement of financial solvency); *but see In re Soderlund*, 197 B.R. at 746 (statement regarding debtor's ability or willingness to pay a debt is not a statement relating to financial condition).

Accordingly, the motion to dismiss the portion of the first claim that relies upon the first two representations is denied, but the portion relating to the third representation is granted.

### 2. Second Claim for Relief

On January 10, 1990, Alicea signed a written guarantee of past and future legal fees to induce the plaintiff to continue to provide legal services. (Amended Complaint ¶¶ 63–64.) Alicea never honored the guarantee and was incapable of honoring it because he had already committed most of his assets to other ventures. (*Id.*, ¶ 64.) Citing § 523(a)(2)(B), the amended complaint asserts that the execution of the guaranty constituted a materially false statement respecting Alicea's financial condition which the plaintiff reasonably relied upon in continuing to provide services. (*Id.*, ¶ 65.) In substance, the plaintiff maintains that Alicea never intended to honor the guarantee at the time that he made it.

 A guaranty is not a financial statement because it lacks financial data. Rather, a guarantee is like any other promise to perform in the future, and may support a fraud claim if the promisor did not intend to honor the guarantee when he made it. *See Fellow, Read & Assocs., Inc. v. Rieder (In re Rieder)*, 178 B.R. 373, 377 (Bankr.S.D.N.Y. 1995), *aff'd*, 194 B.R. 734 (S.D.N.Y.1996), *aff'd without op.*, 116 F.3d 465 (2d Cir.1997). I recognize that guarantees are not quite the same as other promises. For example, lending institutions insist on them from the principals of corporate borrowers. Depending on the size of the loan, the guarantor's ability to

---

**10.** Section 101(32) states:

"insolvent" means—

(A) with reference to an entity other than a partnership, and a municipality, *financial condition* such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title;

(B) with reference to a partnership, *financial condition* such that the sum of such partnership's debts is greater than the aggregate of, at a fair valuation—

(i) all of such partnership's property, exclusive of property of the kind specified in subparagraph (A)(i) of this paragraph; and

(ii) the sum of the excess of the value of each general partner's nonpartnership property, exclusive of property of the kind specified in subparagraph (A) of this paragraph, over such partner's nonpartnership debts; and

(C) with reference to a municipality, *financial condition* such that the municipality is—

(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or

(ii) unable to pay its debts as they become due.

(Emphasis added.)

pay may be nonexistent and unimportant. Resolution of such cases ultimately turns on the intention of the parties, the materiality of the guarantee to the transaction, and the justifiability of the promisee's reliance.

Accordingly, although the second claim falls outside of subdivision (B), it states a claim under subdivision (A). The written guarantee is a representation of intention to perform in the future. The plaintiff alleges that Alicea knew he could never honor his guarantee based upon his other commitments. In addition, the allegations of *scienter* that buttressed the oral personal guarantee cause of action in the first claim also apply to the second claim for relief.

■ This claim merits a word of caution. Only those legal services rendered after the guarantee are potentially nondischargeable. *See Fellows, Read & Assocs., Inc. v. Rieder,* 194 B.R. 734, 738 (S.D.N.Y.1996) (under the plain language of § 523(a)(2)(A), the services induced by the debtor's fraudulent guarantee cannot include the services performed *prior* to the misrepresentation), *aff'd without op.,* 116 F.3d 465 (2d Cir.1997). The amended complaint indicates that the majority of legal fees were incurred prior to the execution of the guarantee. (*See Amended Complaint* ¶ 19).

### 3. Third Claim for Relief

The third claim is not related to the plaintiff's fees. Rather, it alleges that Alicea fraudulently induced the plaintiff to invest $100,000 toward the acquisition of certain Easthampton, New Jersey property. According to the amended complaint, Alicea misrepresented that (1) he had received firm offers (the "Flip Offers") and intended to flip the deal within a few months of closing, (2) he would use his personal assets to pay mortgage installments, if necessary, and (3) he would use the closing proceeds from other ventures to pay mortgage installments, again if necessary. (Amended Complaint ¶¶ 68–70.)

■ The body of the third claim does not allege *scienter.* Specifically, it does not aver that Alicea knew or believed that he did not have the Flip Offers he claimed to have.

Further, the common allegations do not fill this gap. Hence, this aspect of the third claim is legally insufficient.

■ The promises to pay the mortgage using personal assets or closing proceeds are on stronger footing. Again, the third claim does not contain allegations of *scienter.* Here, however, the common allegations supply the missing element. As stated earlier, the amended complaint sufficiently alleges that Alicea could not honor his promise to pay the plaintiff's legal fees and expenses using his personal assets or the closing proceeds. These allegations also support the inference that he knew he could not pay the mortgage installments from these sources. Hence, these allegations are sufficient to withstand a motion to dismiss. Finally, for the reasons discussed above, the promises to pay from personal assets or closing proceeds are not statements relating to financial condition.

Having found the Flip Offers claim insufficient, I must turn to the plaintiff's collateral estoppel argument. The third claim in the amended complaint is similar to the plaintiff's Eleventh cause of action in his state court complaint. The state court entered a default judgment on that cause of action. The plaintiff contends that I should deny the motion to dismiss based upon the collateral estoppel effect of the default judgment. In other words, the judgment prevents Alicea from challenging the legal sufficiency of the bankruptcy claim.

■ Assuming that I can consider the default judgment at all on this motion to dismiss, it does not help the plaintiff's cause. The collateral estoppel effect of the plaintiff's default judgment is governed by New York law. *Kelleran v. Andrijevic,* 825 F.2d 692, 694 (2d Cir.1987), *cert. denied,* 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988); *see State v. Sokol (In re Sokol),* 113 F.3d 303, 306 (2d Cir.1997) ("the preclusive effect of a state court determination in a subsequent federal action is determined by the rules of the state where the prior action occurred"). New York gives collateral estoppel effect to issues "necessarily decided" by the default judgment, *i.e.,* matters essential to sustain the judgment. *Fairchild, Arabatzis &*

*Smith, Inc. v. Prometco (Produce & Metals) Co., Ltd.,* 470 F.Supp. 610, 617 (S.D.N.Y. 1979); *see In re Suarez,* No. 95 CV 5038, 1996 WL 480809, at *3 (E.D.N.Y. Aug. 9, 1996). If the proponent of collateral estoppel demonstrates an identity of the issues, the opponent must demonstrate that he did not have a full and fair opportunity to litigate the issue in the prior action. *See In re Sokol,* 113 F.3d at 306; *Tantillo v. Giglio,* 156 A.D.2d 664, 549 N.Y.S.2d 432, 433 (N.Y.App. Div.1989) (in determining collateral estoppel effect of default judgment, court must consider relative importance of the two suits and whether the insignificance of the first action caused the default).

■ The plaintiff cannot establish that the fraudulent nature of the Flip Offers representation was necessarily decided by the state court or needed to sustain the default judgment on the Eleventh cause of action. The Eleventh cause of action includes an entirely separate claim that Alicea breached his fiduciary duty to the plaintiff *after* the investment was made. (*Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss the Complaint,* dated Aug. 26, 1998 ("State Court Complaint"), Ex. "A", at ¶ 79.) These allegations do not appear in the third claim in the bankruptcy complaint.[11] The state court could have based its default judgment on some or all of the fraud corresponding to the third claim. Or it could have based the default judgment on the breach of fiduciary duty claims that are not presented. Because it is impossible to determine what the state court rested its judgment on, the judgment does not preclude Alicea from litigating the issue. *See In re Suarez,* 1996 WL 480809, at *3.

### 4. Fourth Claim for Relief

The fourth claim alleges that the plaintiff was fraudulently induced to deliver his work files and enter into the settlement agreement. (Amended Complaint ¶ 73.) According to the plaintiff, Alicea promised that he would provide block and lot descriptions on the Van Name units for the purpose of preparing recordable mortgages. These mortgages would secure payment of the settlement. In addition, Alicea promised not to close units unless the proceeds were sufficient to fund the settlement payments. (*Id.,* ¶ 74.) The plaintiff relied upon the false statements by turning over his work files and delaying the institution of a damage action. (*Id.,* ¶ 75.)

■ Here, the plaintiff fails to allege *scienter,* and there is no basis to infer from the allegations that Alicea did not intend to perform the promises aside from the fact that he generally did not perform them.[12] Further, the state court default judgment does not help. The allegations in the fourth claim correspond to the Fourteenth cause of action on which the state court entered a default judgment. The Fourteenth cause of action, however, goes beyond the contents of the fourth claim, and alleges additional fraudulent misrepresentations occurring *after* the execution of the settlement agreement. (*See* State Court Complaint ¶ 99.) As with the third claim, it is not possible to determine what the state court necessarily decided when it granted the default judgment. Accordingly, the fourth claim is dismissed.

### 5. Fifth Claim for Relief

The fifth claim, brought under 11 U.S.C. § 523(a)(2)(B), alleges that Alicea executed a letter agreement, dated April 11, 1991, containing a schedule of payments relating to the settlement. (Amended Complaint ¶ 78.) According to the plaintiff, the schedule constituted a written statement of the financial condition of LA Development Corp., one of Alicea's affiliates. (*Id.*) Alicea made the schedule with the intent to deceive, the plaintiff reasonably relied upon it and suffered damages. (*Id.,* ¶¶ 78–79.)

■ A schedule of payments does not qualify as a statement relating to financial condition under any of the views discussed above. To the extent the schedule expresses or implies a promise to pay the amounts set forth, it adds nothing to the fourth claim and

11. These allegations correspond to ¶¶ 29–30b in the "background" section of the amended complaint. They were not made part of the claims for relief, presumably because they do not support a claim of nondischargeability.

12. In fact, the plaintiff concedes that Alicea made or caused his affiliate to make one $750 payment from closing proceeds. (Amended Complaint ¶ 40.)

merits the same fate. Although *scienter* may be pleaded generally, *see* Fed.R.Civ.P. 9(b), the pleader must still "allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994); *accord Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 663 (2d Cir.1997); *Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996). A strong inference of fraudulent intent may be established in one of two ways: "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d at 1128; *accord Chill v. General Elec. Co.*, 101 F.3d at 267.

Here, plaintiff's conclusory allegation of "intent to deceive" is inadequate. He has not pleaded facts regarding LA Development Corp.'s financial condition at the time of the settlement agreement, or its relation to the closing proceeds. All the amended complaint reveals is that LA Development Corp. is one of Alicea's "entities," and that the plaintiff performed legal work for Alicea and LA Development Corp. in connection with the Van Name Development. (Amended Complaint ¶ 5.) This does not raise an inference, let alone a strong inference, that Alicea knew when he agreed to the schedule of payments that LA Development Corp. would lack the funds to make the payments as they became due.[13] Accordingly, the fifth claim is dismissed.

### 6. Sixth Claim for Relief

In the sixth and final claim, the plaintiff incorporates all of the previous allegations, and avers that Alicea's conduct caused willful and malicious injuries. (Amended Complaint ¶ 81.) "Willful," as used in § 523(a)(6), means "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury," *Kawaauhau v. Geiger*, 523 U.S. 57, ——, 118 S.Ct.

974, 977, 140 L.Ed.2d 90 (1998), and includes conduct that the actor is substantially certain will cause injury. *See Ehrman v. Feist (In re Feist)*, 225 B.R. 450, 455 (Bankr.D.N.D. 1998); *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9, 18 (Bankr.D.Me.1998); Restatement (Second) of Torts § 8A (1965). This refers to intentional torts, but excludes negligent and reckless behavior. *Kawaauhau v. Geiger*, 523 U.S. at ——, 118 S.Ct. at 977. "'[M]alicious' means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir.1996).

Alicea summarily dismisses the sixth claim without much comment or analysis. He observes, however, that the invocation of this exception is an attempt to avoid the writing requirement for claims based upon fraudulent statements respecting financial condition demanded by § 523(a)(2)(B). This implicitly raises the question of whether the fraud and willful and malicious injury exceptions, contained respectively in §§ 523(a)(2)(B) and (a)(6), are mutually exclusive.

Initially, most courts that have considered the question hold that the provisions of § 523(a)(2)(A) and § 523(a)(6) are not mutually exclusive. *E.g., Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 857 (1st Cir. 1997) (neither the language of § 523 nor the legislative history indicate that Congress intended these two sections to be mutually exclusive); *In re Stokes*, 995 F.2d 76, 77 (5th Cir.1993) (*per curiam*); *Romesh Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte)*, 180 B.R. 223, 231 (9th Cir. BAP 1995), *aff'd*, 96 F.3d 1319 (9th Cir.1996); *see Casey v. Transport Life Ins. Co. (In re Dorsey)*, 162 B.R. 150, 155–56 (Bankr.N.D.Ill.1993); *contra In re Price*, 123 B.R. at 45 (each section of § 523 is exclusive of the others).

In *In re Barrack*, 217 B.R. 598 (9th Cir. BAP 1998), however, the court distinguished claims based on oral statements respecting financial condition. The creditor in such a

---

13. The Eleventh cause of action in the State Court Complaint alleges that Alicea knew, when he promised to pay the Easthampton mortgage (as well as the legal fees) from the closing proceeds, that the state court defendants, a group that included LA Development, could not meet these obligations. (State Court Complaint ¶ 74(d).) As already discussed, the default judgment entered with respect to the Eleventh cause of action does not provide any collateral estoppel benefit. Moreover, Alicea made these representations in 1988. The fifth claim for relief refers to representations made in April 1991.

circumstance could not prevail under § 523(a)(2) because subparagraph (A) does not apply, and subparagraph (B), which does, requires a written statement. Suggesting that §§ 523(a)(2) and (a)(6) are coextensive, the court concluded that the creditor's inability to prove the elements of the former meant that he also could not prove the latter. *Id.* at 606; *see Klause v. Thompson (In re Klause),* 181 B.R. 487, 493 n. 4 (Bankr. C.D.Cal.1995) ("This Court cannot conceive of a fact situation under § 523(a)(2) that would not also support a judgment under § 523(a)(6)").

I need not conclude that these two sections are coextensive to agree with the *Barrack* court's conclusion.[14] *See Kawaauhau v. Geiger,* 523 U.S. at ——, 118 S.Ct. at 977 (one provision of § 523(a) should not be interpreted in a way that obviates the need for another provision of § 523(a)). Whatever § 523(a)(2)(B) means, it was intended to protect debtors by restricting certain kinds of dischargeability claims based on fraud. A creditor armed only with an oral statement of financial condition should not be able to circumvent these protections by charging that the same conduct produced a "willful and malicious" injury. Accordingly, fraud claims barred under § 523(a)(2)(B) are also barred under § 523(a)(6).

The plaintiff, however, has asserted several legally sufficient claims under § 523(a)(2)(A). The amended complaint alleges that Alicea fraudulently misrepresented his intention to pay the plaintiff's legal fees and the Easthampton mortgage. These representations were intended to induce the plaintiff to provide legal services and invest $100,000.00. The plaintiff did so, and was injured. Alicea intended by his fraud to cause the injury that resulted without just cause, and this states a claim under § 523(a)(6). Accordingly, those portions of the amended complaint which state claims for relief under § 523(a)(2)(A) also state claims for relief under § 523(a)(6).

## CONCLUSION

Alicea's motion to dismiss is granted to the extent of: (1) that portion of the first claim relating to Alicea's statement that he or his affiliate could not currently pay the legal fees; (2) that portion of the third claim relating to Alicea's representation that he had "Flip Offers"; (3) the entire fourth and fifth claims; and (4) that portion of the sixth claim that realleges the above-dismissed claims or portions of claims as willful and malicious injuries. The motion is denied as to the second claim and the remaining portions of the first, third and sixth claims. The parties are directed to settle an order consistent with this opinion, and contact chambers to schedule a pretrial conference.

---

14. One who makes a fraudulent misrepresentation is liable to those who "he intends or has reason to expect" will act in reliance on his misrepresentation. Restatement (Second) of Torts § 531. "Reason to expect" signifies a reasonable man standard. *Id.,* § 531 cmt. d. Speaking hypothetically, the debtor may make a statement he knows is false, but he may nonetheless lack the subjective intent or desire to cause injury. For example, he may make a false statement in jest that he honestly (but foolishly) believes his listener will disregard. Nevertheless, the listener may justifiably rely on the statement, a result any reasonable man would have foreseen. This may not be the intentional injury that *Geiger* requires.